UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.  CASE NO: 2:12-CR-20-FtM-29SPC

DONTRE REON CRAWFORD

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on The Defendant, Dontre Reon Crawford's Motion to Suppress Evidence (Doc. #18) filed on March 30, 2012. The Government filed its Response in Opposition (Doc. #23) on April 5, 2012. A hearing was held before the undersigned United States Magistrate Judge on May 16, 2012. The Defendant was present and represented by Assistant Federal Public Defender Russell Rosenthal. The Government was represented by Assistant United States Attorney Jeffrey Michelland.

At the hearing, the Government called two (2) witnesses: Officer Lesa Breneman and Officer Robert Kerbs of the Fort Myers Police Department (FMPD). The Government also introduced three exhibits: aerial photographs related to the traffic stop (Govt. Ex. 3A-C), a transcript of the traffic stop (Govt. Ex. 4), and a DVD of the traffic stop from the dashboard camera of Officer Breneman's vehicle (Govt. Ex. 1). The Defendant called two (2) witnesses, Officer Jason Jackson, also of the FMPD, and Dino Lazzizzera, Investigator for the Office of the Federal Public Defender.

## TESTIMONY AND EVIDENCE

### Officer Lesa Breneman:

Officer Lesa Breneman ("Officer Breneman") is employed with the traffic enforcement unit of the FMPD, where she has served for three years. (Tr. 4:13-21). Prior to joining the FMPD, Officer Breneman served as a police officer in Maryland for nearly eleven years in numerous divisions, including narcotics. (Tr. 5:11-14, 60:18-20). On January 2, 2012, Officer Breneman stationed her patrol car in the left-turn lane of Martin Luther King Jr. Boulevard ("MLK Blvd.") to conduct speed enforcement. (Tr.5:18-25, 7:21-25, 8:15-18). While at this location, Officer Breneman observed the Defendant's vehicle heading southbound on Velasco Street toward MLK Blvd. (Tr. 8:20-23). When the Defendant stopped his vehicle at the intersection of Velasco St. and MLK Blvd., Officer Breneman observed through the Defendant's windshield that both the driver's and passenger's seatbelts appeared to be vertical at the belt post; indicating that neither of the occupants were wearing their seatbelt as required by Florida Law. (Tr. 8:20-25, 9:1-6).

After observing neither occupant wearing their seatbelt, Officer Breneman made a U-turn on MLK Blvd. to follow the Defendant's vehicle. (Tr. 10:6-8). Shortly after Officer Breneman began following the Defendant's vehicle, the Defendant turned left onto Cranford Street; at this time, Officer Breneman activated her patrol car lights for a traffic stop. (Tr. 10:22-23, 11:1-17). Before approaching the vehicle, Officer Breneman observed movement by the occupants of the vehicle, prompting Officer Breneman to call for a back-up officer for assistance with the stop. (Tr. 17:17-24, 18:11-16). Officer Breneman approached the Defendant's vehicle before back up arrived to obtain the Defendant's driver's license and registration, which the Defendant provided to Officer Breneman. (Tr. 18:18-20, 19:6-19). In addition, Officer Breneman observed at this

2

point that the Defendant was wearing his seatbelt. (Tr. 43:19-22). The passenger, Mr. Young, was also wearing his seatbelt at this time. (Tr. 43:23-25). After Officer Breneman retrieved the Defendant's documents and walked back to her patrol car, Officer Robert Kerbs ("Officer Kerbs") arrived at the traffic stop as back up. (Tr. 20:19-21). Officer Breneman indicated to Officer Kerbs that she possibly smelled the odor of marijuana coming from the vehicle, but was uncertain because she was suffering from a sinus infection at the time. (Tr. 20:23-25, 21:1-4).

While Officer Breneman was still in her vehicle issuing the seatbelt citations, Officer Kerbs returned to Officer Breneman's vehicle and indicated that he smelled a faint odor of marijuana and observed cigar guts in a cup, which to him was indicative of marijuana use. (Tr. 23:2-6, 50:20-24). Officer Breneman indicated she had reasonable suspicion of criminal activity and probable cause that the occupants had committed a noncriminal traffic infraction under the Caroll doctrine, which prompted Officer Kerbs to re-approach and search the vehicle. (Tr. 26:3-8, 37:1-12). Officer Breneman observed Officer Kerbs detain the Defendant after the Defendant refused to comply with Officer Kerbs' instructions regarding exiting the vehicle. (Tr. 28:12-21). After the Defendant was detained in handcuffs by Officer Kerbs, Officer Breneman observed the Defendant "indexing" as he walked in front of her vehicle with Officer Kerbs. (Tr. 30:1-2; 31:5-18). "Indexing" meant the Defendant moved his hands from the natural handcuffed position to his right side and flipped his hand around, as if the Defendant was trying to keep an object secure in that location. (Tr. 29:21-25. 30:1-17). At that point, Officer Breneman exited her vehicle to alert the other officers of the possible weapon. (Tr. 32:4-22). After being alerted to the possible weapon, the officers felt a weapon in the location pointed out by Officer Breneman. (Tr. 33:1-3). The officers initiated a take-down of the Defendant, which Officer Breneman assisted in by holding her Taser against the Defendant's shoulder to prevent him from making any movements.

3

(Tr. 33:4-23). Defendant was placed under arrest and police officers searched the Defendant's vehicle. (Tr. 52:23-24). No marijuana was found in the vehicle. (Tr. 52:25, 53:1-9).

**Officer Robert Kerbs:**

Officer Kerbs is employed as a patrol officer with the FMPD, where he has served for four years. (Tr. 65:6-12). Prior to joining the FMPD, Officer Kerbs served as a police officer with the United States Air Force for nine years. (Tr. 65:18-21). During his service as a police officer with the United States Air Force and FMPD, Officer Kerbs testified that he received extensive training regarding marijuana. (Tr. 67:15-17). This training included controlled burns of different types of marijuana, which enabled him to detect its presence while on patrol. (Tr. 67:17-25, 68:1-4). On January 2, 2012, Officer Kerbs was on patrol in Ward seven, which covers MLK Blvd. to Palm Beach Boulevard and Fowler Street to Ortiz Avenue. (Tr. 65:24-25, 66:1). He received a radio transmission from Officer Breneman asking for assistance with a traffic stop located on the border of Ward six and seven. (Tr. 66:2-14). After arriving on the scene, Officer Kerbs made contact with Officer Breneman who indicated that there was a possible marijuana odor coming from the vehicle. (Tr. 66:18-25). However, Officer Breneman stated she was uncertain about the odor due to the fact that she was suffering from a sinus infection; therefore, Officer Breneman asked Officer Kerbs to approach the vehicle to confirm or deny her suspicion. (Tr. 66:22-25, 67:1). At this point, Officer Kerbs approached the Defendant's vehicle with Officer Jason Jackson ("Officer Jackson"), who responded to Officer Breneman's radio call for assistance at the same time as Officer Kerbs. (Tr. 68:14-15, 72:1-4).

After approaching, Officer Kerbs began to engage in conversation with the Defendant to keep the Defendant calm and to allow him the opportunity to confirm or deny Officer Breneman's suspicion about the marijuana odor. (Tr. 69:8-12). During this conversation, the

Defendant spontaneously stated to Officer Kerbs, "she got me, I did not have my seat belt on." (Tr. 72:5-7, 89:8-12). In addition, while talking with the Defendant, Officer Kerbs observed a Styrofoam cup in the Defendant's car and asked the Defendant for permission to observe the contents of the cup, which Officer Kerbs suspected might be alcohol. (Tr. 70:12-18). The Defendant complied and handed the cup to Officer Kerbs, who observed cigar guts and a small amount of liquid in the cup. (Tr. 73:6-11). Officer Kerbs returned to Officer Breneman's vehicle and confirmed that there was a "faint" odor of marijuana in the vehicle and that there was a cup in the car that contained cigar guts. (Tr. 73:13-21, 74:2-4). Officer Kerbs testified that the "faint odor" of burned marijuana was indicative of marijuana being in the Defendant's vehicle. (Tr. 74:21-25, 75:1).

Officer Kerbs indicated to Officer Breneman that he was going to remove the Defendant and the passenger, Lonnie Young ("Young"), from the vehicle to conduct a search for marijuana based on the faint smell of marijuana and the cigar guts in the cup. (Tr. 74:12-15, 21-25, 75:1). When Officer Kerbs returned to the Defendant's vehicle, he opened the Defendant's door and asked the Defendant to step out of the vehicle. (Tr. 74:21-25). At this point, Officer Kerbs had his left hand holding the door open to prevent the Defendant from fleeing and his right hand pointing to the fence area where Officer Kerbs was attempting to guide the Defendant. (Tr. 75:12-14, 78:5-10, 97:2-6). The Defendant stepped out of the vehicle holding his papers requested by Officer Breneman, but refused to follow Officer Kerbs' directions to walk over to the fence. (Tr. 77:2-15). After the first refusal, the Defendant attempted to sit back down in his vehicle and stated to Officer Kerbs that "he did not feel comfortable" and "had to put stuff in his vehicle." (Tr. 77:12-15). After multiple (at least three) refusals, Officer Kerbs observed the Defendant's body "tense up." (Tr. 78:14-25, 80:24). Officer Kerbs testified that his experience

5

in law enforcement led him to believe that the suspect was entering "fight or flight response"; therefore, Officer Kerbs began to fear for his safety. (Tr. 81:7-13). Based on this concern for officer safety, Officer Kerbs handcuffed the Defendant. (Tr. 80:23-25). Officer Kerbs informed the Defendant he was not under arrest at that point, but was simply being detained for safety reasons. (Tr. 79:21-22).

The Defendant was then led away by other officers on the scene, including Officer Jackson, in order to allow Officer Kerbs to search the vehicle for marijuana. (Tr. 84:9-25). While observing the Defendant being led towards the fence area, Officer Kerbs heard the other officers indicate that the Defendant had a weapon on his person. (Tr. 85:11-12). Officer Kerbs ran over to assist the other officers with the take-down of the suspect; however, Officer Kerbs could not recall whether he pulled out his weapon initially or not. (Tr. 86:4-7). After the Defendant was secured, Officer Kerbs completed a search of the car, including the passenger area and the trunk; however, no marijuana was found in the vehicle. (Tr. 93:10-25, 94:1-9).

**Officer Jason Jackson:**

Officer Jackson is employed as a patrol officer with the FMPD, where he has been employed for 7 years. (Tr. 111:15-25). Officer Jackson testified that he had stopped the Defendant earlier on January 2, 2012, for a traffic violation. (Tr. 112:6-12). Officer Jackson indicated that no arrest was made during this traffic stop, nor did he smell any marijuana in the vehicle at that time. (Tr. 112:19-24). Later that day, Officer Jackson arrived on the scene when Officer Breneman called for assistance with a traffic stop. (Tr. 113:4-13). During the traffic stop, Officer Jackson assisted from the passenger side of the Defendant's vehicle. (Tr. 114:2-15). He could not smell marijuana coming from the car while he engaged the passenger, Young, in conversation. (Tr. 116:14-15, 117:1-9). Officer Jackson could not recall if he told Officer Kerbs

whether or not he smelled marijuana (Tr. 116:23-25). Officer Jackson remained with Young while the Defendant was arrested and the firearm was seized. (Tr. 118:6-12).

**Investigator Dino Lazzizzera:**

Dino Lazzizzera ("Investigator Lazzizzera") is employed with Federal Public Defender's Office, where he serves as a special investigator. (Tr. 122:21-22) Investigator Lazzizzera testified that on May 15, 2012, he went to the location where Officer Breneman was sitting when she initially observed the traffic infraction. (Tr. 123:19-21). While at this location, Investigator Lazzizzera had a test vehicle follow the same route that the Defendant's vehicle took on January 2, 2012. (Tr. 123:22-25, 124:1-10). When the test vehicle reached the stop sign where the Defendant's vehicle was stopped when Officer Breneman observed the infraction, Investigator Lazzizzera testified that he was unable to see into the windshield of the test vehicle due to a glare. (Tr. 124:11-15). Therefore, Investigator Lazzizzera was unable to determine whether the occupants of the test vehicle were wearing their seat belts. (Tr. 124:16-19). However, Investigator Lazzizzera testified that he conducted this test in May at 11:30 a.m., whereas the traffic infraction was observed in January at 4:18 p.m. (Tr. 125:7-16).

## DISCUSSION

The Defendant argues that the handgun found on the Defendant's person should be suppressed from use during trial because (1) the initial traffic stop was unlawful and (2) the subsequent search of the Defendant was unlawful. The Government contends that (1) there was probable cause for a traffic stop of the Defendant's vehicle and (2) the pat down of the Defendant and seizure of the handgun were lawful based upon reasonable suspicion; as a result, the evidence obtained by the officers should be admissible during trial.

7

## *(1) WHETHER THE TRAFFIC STOP OF THE DEFENDANT'S VEHICLE WAS LAWFUL*

Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred, and an officer's motive in making the traffic stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment." United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (quoting Whren v. United States, 517 U.S. 806, 810-12, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)). Florida's Safety Belt Law states in part, "(4) [i]t is unlawful for any person . . . (b) [t]o operate a motor vehicle in this states unless the person is restrained by a safety belt," and "(5) [i]t is unlawful for any person 18 years of age or older to be a passenger in the front seat of a motor vehicle unless such person is retrained by a safety belt when the vehicle is in motion." Fla. Stat. § 316.614. Furthermore, Florida case law states that an observed violation of the Florida Safety Belt law is sufficient probable cause to conduct a traffic stop. Hatcher v. State, 834 So. 2d 314 (Fla. Dist. Ct. App. 2003) (asserting that a traffic stop for a violation of Florida's Safety Belt Law was valid).

In the case at hand, the Defendant argues that Officer Breneman's stop of the Defendant's vehicle was unlawful. Specifically, the Defendant contends that Officer Breneman was not able to clearly see whether the Defendant or passenger Young were wearing their seat belts from her location on MLK Blvd. Officer Breneman testified that while she was conducting speed enforcement on MLK Blvd. on January 2, 2012, she was able to clearly see through the Defendant's windshield that both the Defendant's and passenger Young's seat belts were vertical at their post; thus, neither seat belt was fastened while the vehicle was in operation. (Tr. 9:1-6). In addition, Officer Breneman clarified that she was able to observe the seat belts as vertical and

could "clearly see their shirts" because she was approximately thirty feet away from the Defendant's vehicle. (Tr. 42:1-8).

The Defendant attempted to rebut the testimony from Officer Breneman by presenting the testimony of Investigator Lazzizzera, who conducted a visual test in the same location. (Tr. 123:19-24). Precisely, Investigator Lazzizzera testified that when he went to the same location as where the traffic violation was observed on MLK Blvd., he was unable to verify whether the occupants of a test vehicle were wearing their seat belts due to a glare on the windshield. (Tr. 124:13-19). However, Investigator Lazzizzera admitted that the sun was in a different position on the day he conducted his test compared to the day when the traffic violation was observed. (Tr. 125:7-16). This difference in sun position was due to the fact that the traffic violation was observed at a different time of day than the test, 4:18 p.m. versus 11:30 a.m., and also due to the fact the traffic violation was observed in January, whereas the test was conducted in May. (Tr. 125:7-17).

In addition, the Defendant points to Officer Breneman's testimony that when she initially approached the Defendant's vehicle, both occupants were wearing their seat belts. (Tr. 43:19-25). However, Officer Breneman also testified that she saw movement in the vehicle before approaching, which prompted her to radio for back up. Based on her law enforcement experience, Officer Breneman testified it is not uncommon for occupants in a vehicle to fasten their seat belts before the officer initially makes contact with the occupants. (Tr. 59:10-12). *See* United States v. Gonzalez, 969 F.2d 999, 1004 (11th Cir. 1992) (stating that officer training and experience can help to establish probable cause). Therefore, Officer Breneman concluded that the movement she observed in the vehicle before initially making contact with the Defendant could have been both occupants securing their seat belts. (Tr. 59:10-12). Moreover, Officer

9

Kerbs testified that when he first approached the Defendant's vehicle, the Defendant stated, "she got me, I did not have my seat belt on"; therefore, this statement indicated that the Defendant did not have his seat belt fastened when Officer Breneman observed the traffic violation on MLK Blvd. (Tr. 72:5-7, 89:8-12).

Investigator Lazzizzera admitted that the sole reason he could not observe whether the test vehicle occupants were wearing their seat belts was due to glare from the sun on the windshield. (Tr. 124:13-15). Although the Court takes no issue with the testimony of Investigator Lazzizzera and finds him to be credible, the Court concludes that because the sun would have been in a different position on January 2, 2012, at 4:18 p.m., Officer Breneman was able to observe the traffic violation from her location on the date and time in question. Therefore, it is recommended that the stop was lawful as Officer Breneman had probable cause at the time of the stop to believe that a traffic violation had occurred.

### (2) WHETHER THE SEARCH WAS LAWFUL

With regards to the search of the Defendant, the Defendant argues that the police unlawfully detained him and unlawfully searched him. The Government contends that the detainment of the Defendant was lawful based on reasonable suspicion and the pat-down of the Defendant for weapons was lawful based on a fear for officer safety.

#### (a) Whether the Officer's Detainment of the Defendant was Lawful

The Supreme Court has held that an officer may ask a defendant to step out of the defendant's vehicle during a lawful traffic stop. Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331 (1977) (stating it is lawful for an officer to ask a defendant to step out of the vehicle to a location that ensures greater safety for both the officer and the

defendant). The Defendant and Government both acknowledge that Officer Kerbs' was justified to ask the Defendant to step out of his vehicle and over to the fence area to continue the investigation in a more secure location. *See also* Terrell v. Smith, 668 F.3d 1244, 1252 (11th Cir. 2012) (asserting it is lawful for an officer to order the driver out of the vehicle during a traffic stop). Therefore, Officer Kerbs' lawfully instructed the Defendant to step out of the vehicle to further conduct an investigation.

After Officer Kerbs lawfully instructed the Defendant to step out of the vehicle, the Defendant initially complied, quickly exiting the vehicle. (Tr. 76:5-16). However, when Officer Kerbs attempted to guide the Defendant's movement toward the fence area where the passenger and Officer Jackson were standing, the Defendant refused. (Tr. 77:12-15). Officer Kerbs testified that he could not remember verbatim what was said during the refusal encounter; however, Officer Kerbs testified that he remembered the Defendant shaking his head no and verbally refusing. (Tr. 77:12-15, 76:23-24, 105:5-11). Specifically, the video of the traffic stop from Officer Breneman's vehicle shows the Defendant shaking his head as indicating that he would not comply with Officer Kerbs' instructions (Govt. Ex. 1 at 99488) and attempting to get back into his vehicle (Govt. Ex. 1 at 99560). After observing the Defendant attempt to get back into his vehicle, Officer Kerbs testified that the Defendant became "tense." (Tr. 80:24). Precisely, Officer Kerbs observed the Defendant's arms lower and become stiff. (Officer Kerbs testified that based on his training and experience, a defendant "tens[ing] up" usually indicates that a defendant is entering "fight or flight mode"; therefore, Officer Kerbs feared that the situation might turn into a physical altercation. (Tr. 81:2-13, 102:13-24). Based on a fear for officer safety due to a possible physical altercation, Officer Kerbs placed the Defendant in handcuffs. (Tr.

79:20-22). After placing the Defendant in handcuffs, Officer Kerbs stated to the Defendant that he was not being arrested, but was simply being detained. (Tr. 79:20-25, 80:1).

The Defendant argues that Officer Kerbs' actions up to this point, including limiting the Defendant's ability to move only in the direction of the fence and placing the Defendant in handcuffs, constituted an unlawful seizure. Specifically, the Defendant states that Officer Kerbs had his left hand on the open driver's door of the Defendant's vehicle and his right hand also blocking a clear path from the vehicle; thus, Officer Kerbs left the Defendant little room to move. Officer Kerbs admitted in testimony to blocking the Defendant from moving in certain directions. (Tr. 78:5-10, 97:2-6). However, the Supreme Court held that "[i]t is . . . reasonable for passengers to expect that a police officer at the scene of a[n] . . . investigation will not let people move around in ways that could jeopardize his safety." Brendlin v. California, 551 U.S. 249, 258, 127 S. Ct. 2400, 2407, 168 L. Ed. 2d 132 (2007). Officer Kerbs testified that he restricted the movement of the Defendant toward the fence area to ensure that the Defendant did not attempt to flee and to ensure officer safety. (Tr. 78:5-10, 97:2-6).

The Defendant further argues that the limited duration of time between Officer Kerbs' instructions to exit the vehicle and Officer Kerbs placing the Defendant in handcuffs, approximately twenty seconds, was not sufficient to establish the reasonable suspicion needed for the handcuffed detention. (Tr 102:21-25, 103:1-4). However, Officer Kerbs testified that through his experience in law enforcement, a defendant could grab a weapon from the vehicle in less than one second or could start the vehicle to flee in less than three seconds. (Tr. 109:11-22). Therefore, the Defendant's refusal to comply with lawful orders, attempt to get back into the vehicle, and "tensing up," gave Officer Kerbs the necessary fear for officer safety. The Eleventh Circuit has made clear that placing a defendant in handcuffs is reasonable during an investigative

detention to protect officer safety. United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989) (asserting that an officer placing a defendant in handcuffs can constitute a Terry stop that is reasonable based on a fear for officer safety). Thus, based on the fear for officer safety, along with Officer Kerbs' statement to the Defendant that the Defendant was only being detained and not arrested, Officer Kerbs' detainment of the Defendant was lawful.

Additionally, both Officer Kerbs and Officer Breneman testified that when they separately approached the Defendant's vehicle, they detected an odor of marijuana emanating from the vehicle. (Tr. 20:1-21, 66:18-25, 67:1-11). The Eleventh Circuit held that "the smell of marijuana alone may provide a basis for reasonable suspicion for further investigation of possible criminal conduct." United States v. White, 593 F.3d 1199, 1203 (11th Cir. 2010). Officer Breneman suspected the odor of marijuana after making initial contact with the Defendant's vehicle, but was uncertain due to suffering from a sinus infection on the day of the stop. (Tr. 20:23-25). After arriving as back up for Officer Breneman, Officer Kerbs confirmed Officer Breneman's suspicion about the odor of marijuana coming from the vehicle and observed cigar guts in a cup present in the vehicle. (Tr. 23:2-6).

Officer Jackson, the third officer present at the scene, testified that he did not smell marijuana coming from the Defendant's vehicle while standing near the passenger window. (Tr. 116:23-25, 117:1-3). Nevertheless, the testimony of Officer Breneman and Officer Kerbs, along with the observation of cigar guts, which based on the training and experience of the officers is indicative of marijuana use, is enough for the Court to conclude that an odor of marijuana was present at the time of the traffic stop. *See* Gonzalez, 969 F.2d at 1004. Therefore, Officer Kerbs' detainment of the Defendant was lawful based on both the Defendant's refusal to comply with

13

lawful instructions from a law enforcement officer and the odor of marijuana emanating from the Defendant's vehicle.

### (b) *Whether the frisk of the Defendant was lawful*

When discussing whether the frisk of a defendant is lawful, the Supreme Court has held, "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." Arizona v. Johnson, 555 U.S. 323, 326-27, 129 S. Ct. 781, 784, 172 L. Ed. 2d 694 (2009). After lawfully detaining the Defendant based upon a fear for officer safety, the Defendant was led from outside his vehicle towards the fence area where the passenger, Young, and other officers were standing. (Tr. 83:22-23). While the Defendant was being led away toward the fence area, his body language and movements while in handcuffs separately caught the attention of both Officer Kerbs and Officer Breneman. (Tr. 29:21-25, 30:1-2, 84:20-25, 85:1). Specifically, Officer Breneman testified that while she was in her vehicle writing the citation for the traffic violation, the Defendant was walked directly in front of her. (Tr. 30:23-24) As the Defendant passed by, Officer Breneman observed what she described as "indexing," a movement done by a defendant to keep an item intact to their body. (Tr. 29:21-25, 30:1-2). While testifying, Officer Breneman pointed out on the DVD footage from the traffic stop that the Defendant can be observed with his hands on his right side as if he is holding something. (Tr. 29:5-25, 30:10-27; Govt. Ex. 1 at 100542). Officer Breneman further testified that this is not the natural hand position when a defendant is in handcuffs, and therefore indicated to Officer Breneman that the Defendant was likely holding a weapon. (Tr. 29:21-25, 30:1-2). After observing what could possibly be a weapon, Officer Breneman alerted the possibility of the Defendant being armed to the officers in control of the Defendant. (Tr. 31:14-18, 32:6-13).

In addition, Officer Kerbs testified that after the Defendant was led away, Officer Kerbs stayed next to the vehicle. (Tr. 83:13-14). As Officer Kerbs observed the Defendant being led away, he noticed the Defendant holding his right side, as if he was protecting an object. (Tr. 84:21-25). This observation occurred nearly simultaneously with Officer Breneman's warning to the other officers. (Tr. 32:15-22). At this point, the officers conducted a pat down of the Defendant in the area pointed out by Officer Breneman. (Tr. 33:1-3). While conducting the pat down, the officers felt the handle of a handgun on the Defendant's right side. (Tr. 33:1-3). At that point, all the officers assisted in subduing the Defendant to allow the weapon to be removed. (Tr. 33:4-23).

The Defendant argues that the officers did not have reasonable suspicion that he was armed and dangerous, which would allow the officers to conduct a frisk of the Defendant. However, as shown above, if an officer reasonably suspects that a Defendant is armed, the officers may conduct a limited frisk of the Defendant for weapons. Johnson, 555 U.S. at 326-27. Based on Officer Breneman's experience, the "indexing" movement by a defendant is usually indicative of the defendant concealing a weapon. (31:6-11). As a result, because Officer Breneman observed the "indexing" movement as the Defendant was being led toward the fence area, and because Officer Kerbs observed the Defendant protecting an object at his side, the officers had a basis to reasonably suspect the Defendant might be armed. Therefore, because the officers reasonably suspected that the Defendant was armed, the limited frisk of the Defendant's right side to check for a possible weapon was lawful. Therefore, it is recommended that the handgun found as a result of the frisk should not be suppressed.

## CONCLUSION

Based on the testimony, evidence, and memoranda of law presented to the Court by the Parties, the Court recommends that the initial traffic stop, detainment of the Defendant, and frisk of the Defendant for weapons were all lawful. Therefore, the Court respectfully recommends that the Defendant's Motion to Suppress the evidence be denied.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant, Dontre Reon Crawford's Motion to Suppress Evidence (Doc. #18) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this 5th Day of June, 2012.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All parties of Record